**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Civil Action No.:_____

| |
|---|
| Joachim Martillo |
|               Plaintiff |
|                 vs. |
| Twitter Inc, |
| Facebook Inc, |
| Linkedin Corp, |
| A Medium Corp, |
| The Stanford Daily Publishing Corp, and |
| Harvard Crimson Inc |
|               Defendants |

**Complaint for Violations**

**of the 1964 Civil Rights Act (Title II)**
**and**
**of Massachusetts Common Carriage Law**
(submitted _____)

1. The above listed Defendants flagrantly discriminate against the Plaintiff with respect to public accommodation for entertainment and exhibition (42 U.S. Code § 2000a). The Plaintiff seeks relief including but not limited to an order to cease and desist such discrimination.

2. A subset of the Defendants hold out common carriage and routinely discriminate against the Plaintiff by refusing to carry the Plaintiff's messages in violation of Massachusetts common carriage law. The Plaintiff seeks relief including but not limited to an order to cease and desist such discrimination as well as an order for the subset of the Defendants, who are common carriers, to pay the Plaintiff the penalties specified by Massachusetts common carrier law (Massachusetts General Laws chapter 159, §§ 1 and 2).

3. Both forms of discrimination have caused the Plaintiff significant harm for which Defendants must compensate the Plaintiff in order to make him whole.

## The Parties

### Plaintiff Joachim Martillo (Plaintiff)

4. Joachim Martillo (Joachim, Martillo) is a citizen of the Commonwealth of Massachusetts (USA) and Dorchester resident. He is also known as John Fallick, Jon Fallick, Jon Falic, or Jonathan Fallick and as Jonathan Affleck or Atallah Aflaq (عطا الله عفلق , יונתן פֿאליק , יונתן פֿאליק).[1] His address is 75 Bailey St. Ste 1L, Dorchester Center, MA 02124-3724. His phone number is 617-276-5788. Joachim is a Diaspora Jew, who descends from Eastern European Rabbinic Jewish communities.

### Defendant Twitter Inc (A Common Carrier, Defendant 1)

5. Twitter Inc (Twitter) operates as a platform for public self-expression and conversation in real time. The company offers various products and services, including the Twitter platform that allows users to consume, create, distribute, and discover content. Twitter provides common carriage both for a fee and in exchange for work. Its address is 1355 Market Street Suite 900, San Francisco, CA 94103, United States. Its phone number is 415-222-9670. Twitter Inc is a Delaware corporation.

### Defendant Facebook Inc (A Common Carrier, Defendant 2)

6. Facebook Inc (Facebook) operates as a social networking company worldwide. The company engages in the development of social media applications for people to connect through mobile devices, personal computers, and other surfaces. It enables users to share opinions, ideas, photos, videos, and other activities online. The firm's products include Facebook, Instagram, Messenger, WhatsApp, and Oculus. Facebook, Instagram, Messenger, and WhatsApp all provide common carriage in exchange for work. The company was founded by Mark Elliot Zuckerberg, Dustin Moskovitz, Chris R. Hughes, Andrew McCollum, and Eduardo P. Saverin on February 4, 2004 and is headquartered in Menlo Park, CA. Facebook's address is 1601 Willow Road, Menlo Park California 94025. Its phone number is 650-543-4800. Facebook Inc is a Delaware corporation.

### Defendant LinkedIn Corp (A Common Carrier, Defendant 3)

7. LinkedIn Corp (LinkedIn) helps people connect to other people in the business world. The firm operates an online professional network designed to help members find jobs, connect with other professionals, and locate business opportunities. The site has grown to reach more than 700 million users in more than 200 countries since its launch in 2003. LinkedIn is free to join; it offers a paid premium membership with additional tools and sells advertising. It additionally earns revenue through its job listing service, which allows companies to post job openings and search for candidates on

---

1   The names عطا الله and יונתן are equivalents. Joachim Martillo is Jonathan Affleck's penname, but he is more commonly known by his penname than by his legal name. Fallick (along with variants) is the original family name. This last name is unfortunately a homonym with the English word phallic. Joachim mostly uses Fallick (פֿאליק) in Israeli government ruled territory when he is dealing with Jews. When he is among Palestinians, he uses Aflaq (عفلق).

LinkedIn. LinkedIn provides common carriage both for a fee and in exchange for work. Linkedin is a subsidiary of Microsoft. Its address is 1000 W Maude Ave, Sunnyvale, CA, 94085-2810  United States. Its phone number is 650-687-3600. LinkedIn Corp is a Delaware corporation.

**Defendant A Medium Corp (Defendant 4)**

8. A Medium Corporation (Medium) provides a blog that enables users to share and experience knowledge, ideas and stories.  Medium's address is 799 Market St FL 5, San Francisco, CA, 94103-2047  United States. Its phone number is 415-508-5008. A Medium Corp is a Delaware corporation.

**Defendant The Stanford Daily Publishing Corp (Defendant 5)**

9. The Stanford Daily Publishing Corporation (Stanford *Daily*) is a nonprofit publisher based in Stanford, CA that was founded in 1892. The mission of the organization is to act as a major source of news relating to or otherwise of interest to the Stanford University community and to provide an educational opportunity to the Stanford University students in journalistic writing, photography, etc. The Stanford Daily's address is 456 Panama Mall, Stanford CA 94305-4006. Its phone number is 650-721-5801. The Stanford Daily Publishing Corp is a California corporation.

**Defendant The Harvard Crimson Inc (Defendant 6)**

10. The Harvard Crimson Inc (Harvard *Crimson*) prints a daily newspaper and contracts work for other newspapers. They were established in 1873 and incorporated in 1967 in Massachusetts. The Harvard Crimson's address is 14 Plympton St., Cambridge, MA 02138-6606. Its phone number is 617-495-7890. The Harvard Crimson Inc is a Delaware corporation.

**Related Proceedings**

11. Related proceedings consist of the following cases.

   a.  *Martillo v. Twitter. Inc.*, Dorchester Municipal Court, Massachusetts, 1907CV000023.

   b.  *Joachim Martillo vs. Facebook. Inc.*, MCAD Docket: 20BPA02274

   c.  *Joachim Martillo vs. Medium Corporation*, MCAD Docket: 20BPA02275

   d.  *Joachim Martillo vs. LinkedIn Corporation*, MCAD Docket: 20BPA02276

   e.  *Joachim Martillo vs. Stanford Daily Publishing Corporation*, MCAD Docket: 20BPA02277

   f.  *Joachim Martillo vs. Twitter. Inc.*, MCAD Docket: 20BPA02278

   g.  *Joachim Martillo vs. The Harvard Crimson. Inc.*, MCAD Docket: 20BPA02279

**Jurisdiction and Venue**

12. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1332.

13. This action arises under 42 U.S. Code §§ 2000a and 2000a–3 as well as under Massachusetts General Laws chapter 159, §§ 1 and 2 (Common Carriage and Penalties).

14. Venue in the District of Massachusetts is proper under 28 U.S.C. §§ 1391(b-c) and 1395(a).

**Introduction**

**Communications Decency Act in the Context of a Public Accommodation Civil Rights Law**

15. Justice Clarence Thomas makes the following remark in *Biden v. Knight*, 593 U. S. ____ (2021), Thomas J., concurring, No. 20–197. Decided April 5, 2021.

> Internet platforms of course have their own First Amendment interests, but regulations that might affect speech are valid if they would have been permissible at the time of the founding. See *United States v. Stevens*, 559 U. S. 460, 468 (2010). The long history in this country and in England of restricting the exclusion right of common carriers and places of public accommodation may save similar regulations today from triggering heightened scrutiny—especially where a restriction would not prohibit the company from speaking or force the company to endorse the speech. See *Turner Broadcasting System, Inc. v. FCC*, 512 U. S. 622, 684 (1994) (O'Connor, J., concurring in part and dissenting in part); *PruneYard Shopping Center v. Robins*, 447 U. S. 74, 88 (1980). There is a fair argument that some digital platforms are sufficiently akin to common carriers or places of accommodation to be regulated in this manner.[2]

16. Because there is no right of free speech on a privately owned social medium platform, this section uses the example of Facebook to show that a social medium Interactive Computer Service (ICS)[3] is a public accommodation that provides a place of exhibition or of entertainment[4] and that is subject to the following statute (Title II of the CRA).

**42 U.S. Code § 2000a - Prohibition against discrimination or segregation in places of public accommodation**

---

[2]   The following sentence "Though digital instead of physical, they are at bottom communications networks, and they 'carry' information from one user to another" is somewhat baffling. Digital phenomena are physical, but the understanding of a scientist or engineer often differs from that of a non-scientist or a non-engineer. The discussion of "place" below provides some clarification.

[3]   This complaint treats Facebook as exemplary of every social medium Interactive Computer Service (ICS).

[4]   The Doctrine of *ejusdem generis* plays no role in Title II, and an account of Facebook is analogous to a ticket for admission to a movie theater.

## Jurisdiction and Venue

12. This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1332.

13. This action arises under 42 U.S. Code §§ 2000a and 2000a–3 as well as under Massachusetts General Laws chapter 159, §§ 1 and 2 (Common Carriage and Penalties).

14. Venue in the District of Massachusetts is proper under 28 U.S.C. §§ 1391(b-c) and 1395(a).

## Introduction

### Communications Decency Act in the Context of a Public Accommodation Civil Rights Law

15. Justice Clarence Thomas makes the following remark in *Biden v. Knight*, 593 U. S. _____ (2021), Thomas J., concurring, No. 20–197. Decided April 5, 2021.

> Internet platforms of course have their own First Amendment interests, but regulations that might affect speech are valid if they would have been permissible at the time of the founding. See *United States v. Stevens*, 559 U. S. 460, 468 (2010). The long history in this country and in England of restricting the exclusion right of common carriers and places of public accommodation may save similar regulations today from triggering heightened scrutiny—especially where a restriction would not prohibit the company from speaking or force the company to endorse the speech. See *Turner Broadcasting System, Inc. v. FCC*, 512 U. S. 622, 684 (1994) (O'Connor, J., concurring in part and dissenting in part); *PruneYard Shopping Center v. Robins*, 447 U. S. 74, 88 (1980). There is a fair argument that some digital platforms are sufficiently akin to common carriers or places of accommodation to be regulated in this manner.[2]

16. Because there is no right of free speech on a privately owned social medium platform, this section uses the example of Facebook to show that a social medium Interactive Computer Service (ICS)[3] is a public accommodation that provides a place of exhibition or of entertainment[4] and that is subject to the following statute (Title II of the CRA).

### 42 U.S. Code § 2000a - Prohibition against discrimination or segregation in places of public accommodation

---

2   The following sentence "Though digital instead of physical, they are at bottom communications networks, and they 'carry' information from one user to another" is somewhat baffling. Digital phenomena are physical, but the understanding of a scientist or engineer often differs from that of a non-scientist or a non-engineer. The discussion of "place" below provides some clarification.

3   This complaint treats Facebook as exemplary of every social medium Interactive Computer Service (ICS).

4   The Doctrine of *ejusdem generis* plays no role in Title II, and an account of Facebook is analogous to a ticket for admission to a movie theater.

**(a) EQUAL ACCESS**

All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin.

**(b) Establishments affecting interstate commerce or supported in their activities by State action as places of public accommodation; lodgings; facilities principally engaged in selling food for consumption on the premises; gasoline stations; places of exhibition or entertainment; other covered establishments**

> Each of the following establishments which serves the public is a place of public accommodation within the meaning of this subchapter if its operations affect commerce, or if discrimination or segregation by it is supported by State action:
>
> ...
>
> (3) any motion picture house, theater, concert hall, sports arena, stadium or other place of exhibition or entertainment; ...

17. Facebook meets all criteria that would require Facebook to come under Title II regulation except possibly providing a place of exhibition or of entertainment.

18. Every Appellate Court has assumed that "place" exists on a geographic surface or in three dimensional space except for the United States Court of Appeals for the Seventh Circuit in *John Doe and Richard Smith, Plaintiffs-Appellees, v. Mutual of Omaha Insurance Company, Defendant-Appellant*, No. 98-4112, Decided: June 02, 1999 (a Title III[5] case that seems relevant to understanding the meaning of "place" in Title II), but the exact meaning of "place" and its possible applicability to the World Wide Web has never been fully litigated.

*Place I*

19. At the time of the Congressional Hearing on the Civil Rights Act of 1964, place already had a well established meaning that referred to a set of locations in computer memory, and a computer like the IBM 7090 was not uncommonly used to provide a place of exhibition or of entertainment for a program like the famous Eliza Natural Language program, which was loaded into a place in computer memory. Joseph Weizenbaum used a place in the memory of an IBM 7090 for display of Eliza and for entertainment of others with the operation of the Eliza program.[6]

---

5   Title III refers to Americans with Disabilities Act (ADA). It has similar language with respect to public accommodation, and SCOTUS has used one statute to elucidate the other.

6   The first computer game was Spacewar!.
- which Steve Russell and Martin Graetz created in 1962 and
- which was loaded into a place in memory of a PDP-1 at MIT for exhibition or for entertainment.

20. There is no distinction between a place in the memory of the IBM 7090 of 1964 and a place in the memory of a vast metacomputer[7] of which today's World Wide Web is an example.

21. This view of a place in memory is analogous to a poster wall where one might hang and exhibit artwork. In a slightly more expansive point of view, the entire IBM 7090 could itself have been considered a place of exhibition or of entertainment.

## Place 2

22. One may consider a public accommodation that Facebook provides in the form of a place for exhibition or entertainment to be a virtual place on the World Wide Web. 42 U.S. Code § 2000a (b) (3) imposes no obligation of materiality on public accommodation that provides a place for exhibition or entertainment, and the Anglo-American common law system has long made peace with the concept of virtualization in the form of a fictitious or legal person, which in more modern terminology albeit not legal terminology is properly considered a virtual person.[8]

## Place 3

23. It is not necessary to consider the public accommodation that Facebook provides to be virtual. Computer scientists use virtualization to describe complex electronic structures including transient gate state structures created by a logic device like a microprocessor. These structures are completely material and connect users of the World Wide Web from displays on desktop, laptop, or mobile devices via transmission media, and various electronic switching devices such as bridges and routers to various

---

The game was covered in the news media, and it was often distributed with a newly purchased PDP-1. While it continued to be played at MIT for over a decade, it was less famous than Eliza.

7   Smarr, Larry & Catlett, Charles. (1992). "Metacomputing." *Commun. ACM*. 35. 44-52. 10.1145/129888.129890. The metacomputer is a network of heterogeneous, computational resources linked by software in such a way that they can be used as easily as a personal computer. In fact, the PC can be thought of as a minimetacomputer, with a general-purpose microprocessor, perhaps floating point-intensive coprocessor, a computer to manage the I/O – or memory – hierarchy, and a specialized audio or graphics chip. Like the metacomputer, the minimetacomputer is a heterogeneous environment of computing engines connected by communications links. Driving the software development and system integration of the NCSA metacomputer are a set of 'probe' metaapplications. In this article, we will look at the three stages of metacomputing, beginning with the local area metacomputer at the National Center for Supercomputing Applications (NCSA) as an example of the first stage. The capabilities to be demonstrated in the SIGGRAPH '92 Showcase environment represent the beginnings of the second stage in metacomputing. This involves advanced user interfaces that allow for participatory computing as well as examples of capabilities that would not be possible without the underlying stage-one metacomputer. The third phase, a national metacomputer, is on the horizon as these new capabilities are expanded from the local metacomputer out onto Gbit/sec network testbeds.

8   The Covid-19 pandemic has accelerated the process of replacing physical public accommodations with virtual public accommodations. If it is not made clear as quickly as possible that the 1964 CRA applies as much to "virtual public accommodations" as it does to physical public accommodations, one can foresee the possibility of pre-1964-CRA Jim Crow-like discrimination reestablishing itself in at least some sectors of interstate commerce. Judge Posner of the Appeals Court of the 7ᵗʰ Circuit was probably trying to articulate the idea of a virtual place of public accommodation when he referred to electronic space in *Mutual of Omaha*.

server devices and to each other. Facebook holds out a place of exhibition or of entertainment. This place is created by means of a set of the electronic structures. This set can be found in a well-defined place within the metacomputer.

### Place 4

24. While 42 U.S. Code § 2000a hardly restricts a public accommodation to a brick and mortar structure, an electronic structure on the World Wide Web is hosted by numerous brick and mortar structures. The brick and mortar structures of the World Wide Web or the Internet includes the structure where a user's desktop, laptop, or mobile device is hosted. Thus, Facebook offers a (possibly temporarily assembled and non-static[9]) place of exhibition or of entertainment in every US jurisdiction except the Federal Circuit.

### Does the Communications Decency Act Override the Civil Rights Act?

25. This section assumes that "place" as used in the CRA is as meaningful for a social medium ICS as it is for a movie theater.

26. The plain text of the relevant civil rights statutes expresses the supremacy of civil rights law (CRA and ADA) over the CDA. It is not clear whether the CDA overrides the FHA or the FHA overrides the CDA, but the FHA became law first, and the CDA contains no explicit override of the FHA.[10]

### CRA of 1964 (Civil Rights Act)

27. The deontic modal "shall" in 42 U.S. Code § 2000a (a) makes elimination of public accommodation discrimination an emphatic duty or obligation[11] and overrides mere policy considerations or mandates. A mandate overrides mere policy considerations.[12]

### FHA (Fair Housing Act)

28. 42 U.S. Code § 3601 explicitly asserts the following.

> It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.

---

9   This sort of place for exhibit and for display can be analogized to a traveling circus.

10  The Ninth Circuit found another reason that the shield of the CDA was pierced in *Fair v. Roommates*, 521 F.3d 1157 (9th Cir. 2008), No. 04-56916, United States Court of Appeals, Ninth Circuit, Decided Apr 3, 2008.

11  If emphatic duty or obligation were not indicated, the statute would use "will" instead of "shall".

12  See *Richards v United States*, 369 US 1, 9 (1962), quoted in *Welsh*, 993 F2d at 1269 ("[W]e must always be cognizant of the fact that 'the legislative purpose is expressed by the ordinary meaning of the words used.'").

### *ADA (Americans with Disabilities Act)*

29. 42 U.S. Code § 12101 (b)(1) expresses the "clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."

### *CDA (Communications Decency Act)*

30. 47 U.S. Code § 230 also states a policy objective.

> (b) **Policy**
> It is the policy of the United States—
>
> **(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;
>
> **(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;
>
> **(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;
>
> **(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and
>
> **(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

### *Deontic Modality of Emphatic Obligation, Mandate, and Policy Must be Reconciled*

31. No federal appeals court has addressed the problem of conflict between civil rights law and the CDA.

32. The policy, mandate, and deontic modality of civil rights law cannot be reconciled with the policy of the CDA unless civil rights law takes precedence over the CDA or overrides it in case of conflict.

33 (i) . Otherwise the CDA could be used to return the USA to:

   a.   pre-CRA public accommodation discrimination,

   b.   pre-ADA public accommodation discrimination, and

   c.   pre-FHA housing discrimination

33 (ii). because a would-be discriminator would need only implement an ICS front-end

   a.   to a public accommodation or

   b.   to a housing offering

33 (iii). in order to re-institute discrimination that the CRA, the FHA and the ADA are meant to eliminate.

34. The CDA became law after the CRA, after the FHA, and after the ADA. The plain text of the CDA provides no indication that the CDA is meant to override civil rights law. The legislative record shows no intention for the CDA to represent such an override.

35. Giving precedence to civil rights over the CDA in the case of conflict does not thwart the policy objectives of the CDA (see above) and, in fact, facilitates CDA policy objective (5) above because without precedence of civil rights law a bad actor could with impunity manipulate or navigate the CDA to stalk or to harass a social medium user as organized Zionists routinely stalk and harass pro-Palestine users on the Facebook social medium platform.

### *Narrow Implications of Subordinating the CDA to Civil Rights Law*

36. The Title II violation by Facebook seems directed primarily at Palestinians, Arabs, Muslims, and Diaspora Jews that reject Zionism. No other groups protected under the CRA seem to be subject to harassment by organized persecutors attempting to establish or to maintain a cultural hegemony.

37. White racial supremacists and conspiracy fanatics will not be able to make use of subordination of the CDA to civil rights law.

### *Summary: CDA Does Not Override CRA*

38. The CDA shield from publishing liability does not address the public accommodation discrimination that malevolent actors are attempting to enforce on every social medium ICS.

39. Zionist groups organize reporting of pro-Palestine users and content in order to prevent Palestinians from having a voice on social media. Such coordinated actions cause direct discrimination against Palestinians on a place of public accommodation. The response of a social medium ICS to such pressure does not represent editorial discrimination. The response is more akin to the behavior of a restaurateur that bans blacks from his restaurant because the KKK has threatened him or his restaurant.

40. Because the vast majority of Arabs and Muslims attempt to display pro-Palestine content, the coordinated actions of Zionist groups create indirect but massive discrimination against Arabs and Muslims on a place of public accommodation.

41. Zionism postulates:

- that the national group descended from ethnic Ashkenazim/Yiddish-speaking Slavo-Turks[13] is defective,

- that the Palestinian national group is illegitimate and may be subjected to genocide by Zionists, and

- that members of the ethnic Ashkenazi national group can cure their defects only:

  - by participating in the genocide of the Palestinian national group and

  - by stealing the homeland of the Palestinian national group.

42. Zionist ideology considers the Jewish diaspora to be a waste and something to be negated.[14] Zionists have especially scorned those Diaspora Jews

- that can participate in the intellectual heritage of Rabbinic Judaism and

- that consider Zionism to result from increasing Jewish illiteracy in Rabbinic Jewish scholarship.

43. Such illiteracy has created a political movement based on misunderstood fairy tales derived from confused misinterpretation of the Hebrew Bible, which is only the backstory to the main Rabbinic Jewish scripture, which is the Talmud.[15] Zionist attitudes toward a Diaspora Jew, who rejects Zionist ideology, consist of pure bigotry and hate. Such Zionist attitudes constitute antisemitism under the IHRA working definition of antisemitism. Zionists undertake coordinated efforts to make sure a social medium discriminates against such a Diaspora Jew and excludes him from the social medium's place of exhibition or of entertainment. (See Drawing 1.)

---

13  Commonwealth Poland, the Czarist Empire, and the USSR all recognized the existence of a national group or nationality consisting of members and descendants of Yiddish-speaking Slavo-Turk Rabbinic Jewish communities. Neither (1) Kypczak-speaking/Krymczak-speaking Polish-Lithuanian-Crimean Tatar Karaite Jewish communities nor (2) Rabbinic Jewish communities of non-Slavo-Turk origin were ever considered part of the ethnic Ashkenazi national group or nationality.

The assertion of a non-existent pan-Judaic ethnonationality is part of a legitimization narrative meant to justify:
- genocide of the natives of Palestine and
- theft of the homeland of said natives.

Before the genocide of 1947-8, the Zionist leadership either had little interest in recruiting or objected to recruiting Jewish non-Europeans into the Zionist colonial-settlement in Palestine because most Jewish non-Europeans were considered racially inferior. The Zionist leadership changed its opinion because it feared that it did not have enough cannon fodder, mine finders, and bullet catchers to hold stolen Palestine. The Zionist leadership contrived to destroy Jewish non-European communities and to force members of said communities to stolen Palestine, where said members could function in the role of ersatz native collaborators.

14  This Zionist ideological theme is called Negation of the Diaspora (שלילת הגולה or שלילת הגלות).

15  For Christians, the Old Testament is only the backstory to the revelation of the New Testament.

44. Thus Facebook violates Title II of the CRA because it is a public accommodation that provides a place of exhibition or of entertainment but discriminates against four protected groups/classes that wish to use this place. The four protected groups that suffer discrimination are:

a.   Palestinians (direct discrimination),

b.   Arabs (indirect discrimination),

c.   Muslims (indirect discrimination), and

d.   Diaspora Jews that reject Zionist ideology (direct antisemitism).



*Drawing 1: Eli Valley provides a satirical view of the new man of the Zionist revolution in comparison with a non-Zionist Diaspora Jew.*

**Communications Decency Act in the Context of Common Carriage Law**

*Common Carriage*

45. A Massachusetts Court applies a straightforward test to determine whether an entity like Twitter, Facebook, or LinkedIn is provides common carriage.

46. The Supreme Judicial Court has defined a common carrier in *Mt. Tom Motor Line, Inc. v. McKesson Robbins, Inc.*, 325 Mass. 45 (Mass. 1949).

> The distinction between a common carrier and a private or contract carrier has been frequently stated. *Houle* v. *Lewonis*, 245 Mass. 254. *Haddad* v. *Griffin*, 247 Mass. 369. *Dion* v. *Drapeau*, 254 Mass. 186. *Commonwealth* v. *Boston Maine Transportation Co.* 282 Mass. 345, 349. A common carrier is one who holds himself out as furnishing transportation to any and all members of the public who desire such service in so far as his facilities enable him to perform the  service, while a contract carrier does not furnish transportation indiscriminately but furnishes it only to those with whom he sees fit to contract. *Paine Furniture Co.* v. *Acme Transfer Storage Co.* 290 Mass. 195. *United States* v. *California*, 297 U.S. 175. *Steele* v. *General Mills, Inc.* 329 U.S. 433. *Ace-High Dresses, Inc.* v. *J.C. Trucking Co. Inc.* 122 Conn. 578. *Trudeau* v. *Pacific States Box Basket Co.* 20 Wn.2d 561. This difference is recognized in § 2 of G.L. (Ter. Ed.) c. 159B, as appearing in St. 1938, c. 483, § 1, as amended, the chapter regulating the transportation for hire of goods by motor vehicles. A carrier may be a common carrier as to one part of its business and a special or contract carrier in another part. *Terminal Taxicab Co. Inc.* v. *Public Utilities Commission of the District of Columbia.* 241 U.S. 252. *Commonwealth* v. *Boston Maine Transportation Co.* 282 Mass. 345, 349. *Rugg* v. *Davis*, 320 Mass. 388, 391. A carrier may be issued a certificate to conduct the business of a common carrier and also a permit to engage in the business of a special or contract carrier. G.L. (Ter. Ed.) c. 159B, § 8.

47. A federal tribunal uses the same logic to determine that an establishment is a  telecommunications or general common carrier.[16] The CDA contains no explicit override of either federal or state common

---

16  See *Frontier Broadcasting Co. v. Laramie Community TV Co.*, Memorandum Opinion and Order, 24 F.C.C. 251, 254, ¶ 7 (Apr. 2, 1958); see *In re Amendment of Parts 2, 91, and 99* of the commission's *Rules Insofar as They Relate to the Industrial Radiolocation Service*, Report and Order, 5 F.C.C.2d 197, ¶¶ 19-20 (Oct. 5, 1968) ("[T]he fundamental concept of a communications common carrier is that such a carrier makes a public offering to provide, for hire, facilities by wire or radio whereby all members of the public who choose to employ such facilities may communicate or transmit intelligence of their own design and choosing between points on the system of that carrier and between such points and points on the systems of other carriers connecting with it."). See also *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC (NARUC I)*, 525 F.2d 630, 641 (D.C. Cir.), cert. denied, 425 U.S. 992 (1976) (finding that the essential elements of common carriage to be (1) "that the carrier undertakes to carry for all people indifferently"); *Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC (NARUC II)*, 533 F.2d 601, 609 (D.C. Cir. 1976) (finding that a common carrier's system is "such that customers 'transmit intelligence of their own design and choosing.'")

carrier law. The CDA states that an ICS may not be held liable as a publisher of third-party content but gives an ICS, which like Twitter, Facebook, and LinkedIn is a common carrier, no immunity to the laws of common carriage.[17]

48. A common carrier can provide common carriage in exchange for a fee or for work. In some of the caselaw, transport by an escalator or elevator can be considered common carriage. The common carrier defendants offer common carriage in exchange both for a fee or for work. When a customer is not charged a fee, the customer exchanges (barters) carriage of data for "eyes on the page," which constitute an extremely valuable item and which enable the common carrier Defendants to charge advertisers and to offer analytics for sale. Barter is hardly an unusual method to pay for common carriage, and a barter passenger has often paid for ocean passage (common carriage) by a similar method. This type of common carriage is often known as work for carriage or work for passage common carriage.

*Does the CDA Override Common Carriage Law?*

49. Despite 47 U.S. Code § 230 a common carrier Defendant is forbidden as a common carrier from suspending a user. If the US Congress had meant in 47 U.S. Code § 230 (e) to exempt an Interactive Computer Service (ICS), which is a common carrier, from the obligations of common carriage, Congress could and would have written that exemption into the statute.[18] The common carrier Defendants provide texting, voice calling, or video calling services, each of which is a minor extension of telegraphy, telex, telephone, or video telephone services, which have for approximately a century (except for video telephone service) been considered to provide forms of common carriage.

50. No federal appeals court has addressed the problem of conflict between common carriage law and the CDA.

*Summary: If a Social Medium Firm is a Common Carrier, it Violates Common Carriage Law by Suspending a User*

51. There is no legal basis for a social medium firm to use the Communications Decency Act to escape its common carrier obligations whether the user is an ordinary person or a public figure like Donald Trump.

---

17  This section expatiates on obiter dicta that SCOTUS Justice Clarence Thomas made in *Biden v. Knight*, 593 U. S. ____ (2021). Thomas J., concurring, No. 20–197. Decided April 5, 2021. See above p. 4.

18  A telegraph company like SendTelegram.Com does not escape its common carrier obligations by providing an Interactive Computer Service (ICS) on the World Wide Web and using this ICS for a front end.

**Statement of Facts**

**Joachim Martillo**

52. Joachim Martillo belongs by ethnicity and national origin to the national group of descendants of Eastern European Yiddish-speaking Rabbinic Jewish communities. More commonly, this group is considered part of the Jewish Diaspora.

53. Zionism is a white European racial supremacist colonial-settler political ideology and movement,[19] whose goal consists of transforming Palestine into a Jewish nation state despite the wishes of the native non-European population of Palestine. Zionists harbor a particular contempt for descendants of the Diaspora that disagree with Zionist aims. Zionists routinely abuse people of Joachim's ethnicity, religious origin, or national origin. Zionists consider non- or anti-Zionist Jews to be defective human beings.

*Twitter (A Common Carrier)*

54. Defendant Twitter is an electronic message common carrier and operates an online microblogging and social networking site on which users post and interact with messages known as "tweets." Twitter generally allows any individual with the ability to access its site to register an account, post tweets, like and retweet tweets, among other things. Twitter also sets the policies and standards for determining who may set up or maintain an account.

55. On or around December 21, 2019, Twitter suspended Joachim's account, ThorsProvoni.

56. On or around January 9, 2020, Twitter suspended Joachim's account, Epistemography.6

57. On September 21, 2020, Twitter suspended Joachim's account, AffleckSW.

58. In all three cases, Twitter asserted the accounts were suspended for "violating [its] rules against hateful conduct." Twitter further stated, "You may not promote violence against, threaten, or harass

---

19 Zionist propagandists often try to deny the white racial supremacist colonial settler nature of Zionism by pointing out that approximately half of the Zionist invader population in stolen Palestine is of Jewish non-European origin. This propaganda is highly misleading. Zionists during the late nineteenth century and during the first half of the twentieth century were almost entirely white racial supremacist Europeans. These white racists had practically no interest in Jewish non-Europeans unless said non-Europeans met acceptable racial criteria. The Zionist leadership in most cases rejected or opposed Jewish non-European immigration into Palestine.

After the initial Zionist genocide of Palestinians from Dec 1947 – 49 (after the start of the international anti-genocide legal regime), the Zionist leadership realized that stolen Palestine could not be held without an infusion of Jewish invaders. The Zionist leadership contrived the destruction of Jewish non-European communities to Palestine in order to force members to join the invader population in stolen Palestine. The leadership intended for these new invaders to constitute an ersatz native collaborator population that would supply cannon fodder, mine finders, and bullet catchers to the Zionist invader army.

other people on the basis of race, ethnicity, national origin, sexual orientation, gender, gender identity, religious affiliation, age, disability, or serious disease."[20]

59. In the first two cases Joachim had pointed out that modern Jews are not descendants of Greco-Roman Judeans while Palestinians are.

60. In the third case, Joachim had tweeted a comment criticizing Zionism and the State of Israel's mistreatment of Palestinians, which drew dislike from certain Zionist account holders who reported Joachim to Twitter's team. Joachim's comment contained no threat of violence and was based on historical facts. Yet, Twitter deemed this comment to be in violation of its rules because it drew dislike from Zionist account holders.

61. Whenever a tweet generates reported dislike from Zionist account holders, Twitter is quick to remove the tweet and/or disable the account which made the tweet. Moreover, Twitter routinely allows a Zionist to make a tweet in support of Zionist political ideology and does not find the tweet to be in violation of its "rules against hateful conduct."

### *Facebook (A Common Carrier)*

62. Facebook provides common carriage of text, voice, and video messages. Facebook operates an online social media and social networking site. Facebook generally allows any individual to set up an account on its site, through which the individual may communicate with other account holders, post comments, display their interests, or even sell items on the Facebook Marketplace. Facebook also sets the policies and standards for determining who may set up or maintain an account.

63. On July 20, 2020, Facebook permanently disabled Joachim's personal account, Joachim Martillo,[21] for "not following the Facebook Community Standards" and further stated that it would not "be able to reactivate it for any reason." Joachim had posted a comment criticizing Zionism and the State of Israel's mistreatment of Palestinians, which drew dislike from certain Zionist account holders who reported Joachim to Facebook's support team. Joachim's comment contained no threat of violence and was based on historical facts. Yet, Facebook deemed this comment to be in violation of its Community Standards because it drew dislike from Zionist account holders.

64. Whenever a post generates reported dislike from Zionist account holders, Facebook is quick to remove the comment and/or disable the account from which the comment was posted. Moreover, Facebook routinely allows Zionists to post comments in support of Zionist political ideology and does not find these comments to be in violation of its Community Standards.

---

20  Joachim has had a number of other Twitter accounts, which Twitter has suspended in violation of the CRA (Title II) and the law of common carriage.

21  Joachim also has an account Joachim Carlo Santos Martillo, which he generally uses for business related purposes, and an account Jonathan Affleck, which corresponds to his legal name. Both of these accounts are routinely suspended temporarily in violation of the CRA (Title II) and common carriage law.

*LinkedIn (A Common Carrier)*

65. Defendant LinkedIn provides common carriage of text messages and operates an online business and employment-related service. LinkedIn generally allows any individual with the ability to access its site to register an account, display educational background, employment history and other credentials and achievements for other accounts holders to view, as well as to contact other account holders, and post articles and comments, among other things. LinkedIn also sets the policies and standards for determining who may set up or maintain an account on its online site.

66. On June 2, 2020, LinkedIn restricted Joachim's account for violating "LinkedIn's User Agreement and Professional Community Policies relating to the sharing of inappropriate content related to hate speech" (LinkedIn Case Reference #200531-002171). The decision to restrict his account stemmed from a comment he posted in disagreement with a Zionist article. In his comment he described "[the] Jewish people of Zionism" to be "exactly congruent to the Aryan race of Nazism," and further added that to "[merely] use the sick twisted concepts of Zionism in public discourse without challenge is a form of mental colonization by Zionism". However, his comment contained no threat of violence and was based on historical facts as well as Rabbinic Jewish thought and intellectual culture. Yet, LinkedIn deemed this comment to be in violation of its rules because it drew dislike from Zionist account holders.

67. Statistical analysis shows, on the other hand, that LinkedIn routinely discriminates against Palestinians, Arabs, and Muslims, who are critical of Zionism, and determines speech disliked by Zionists is hate speech. Moreover, Twitter routinely allows Zionists to post comments in support of Zionist political ideology and does not find these comments to be in violation of its rules against "hate speech."

68. LinkedIn later unsuspended Joachim's account and then subsequently permanently disabled Joachim's account in May 2021. LinkedIn has provided no information except to allege a violation of terms of service.

*Medium*

69. Defendant Medium Corporation operates an online blog that enables users to share and experience knowledge, ideas and stories. Medium also sets the policies and standards for determining who may set up or maintain an account on its online site.

70. On or about March 23, 2020, Medium permanently suspended Joachim's online membership and deemed it "ineligible for reinstatement under [Medium's] rules." The decision to restrict his account stemmed from an essay Joachim posted in disagreement with Zionist ideology. The essay contained no threat of violence and was based on historical facts. Yet Medium deemed this essay to be in violation of its rules because it drew dislike from Zionist account holders.

71. Analysis of content posted on Medium shows that Medium routinely discriminates against Palestinians, Arabs, and Muslims, who are critical of Zionism, and determines speech disliked by Zionists violates Medium's rules. On the other hand, Medium routinely allows Zionists to post content and comments in support of Zionist political ideology and does not find such content and comments to be in violation of its rules.

### Stanford Daily

72. Defendant Stanford *Daily* Publishing Corporation is a nonprofit publisher operating as a major source of news relating to or otherwise of interest to the Stanford University community and serving to provide an educational opportunity to the Stanford University students in journalistic writing, photography, and other related fields. Stanford *Daily* also sets the sets the policies and standards for determining who may post comments on Stanford *Daily*'s online site.

73. On or about May 25, 2020, Joachim posted several comments on Stanford Daily's online site, which were all critical of an article Stanford *Daily* had published entitled, "I'm an Israeli-American. Let's talk about it." This article represented a decidedly Zionist viewpoint. However, because Joachim was a Jewish critic of Zionism, Stanford *Daily* removed all of comments within the next couple of days. Joachim's comments contained no threat of violence and were based on historical facts. Yet, Stanford Daily deemed this comment to be in violation of its rules because it drew dislike from Zionist account holders.

74. This Defendant has a long history of publishing pro-genocide anti-Palestine content and routinely discriminates against those that attempt to use the public accommodation that this Defendant provides for exhibition and entertainment by allowing readers to comment on published articles. Additionally, while Respondent is quick to remove any comments expressing a pro-Palestinian, anti-Zionist viewpoint, it does not remove the comments posted by pro-Zionist readers.

### Harvard Crimson

75. Defendant The Harvard *Crimson*, Inc. publishes a daily newspaper (both print and online) and contracts work for other newspapers. The Harvard *Crimson* also sets the sets the policies and standards for determining who may post comments on its online site.

76. On September 25, 2020, Joachim posted a comment on The Harvard *Crimson*'s online site, in response to an article it had published, entitled "Erekat, HKS Fellow and Palestinian Negotiator, Criticizes Israeli Accords with Bahrain and United Arab Emirates." Joachim's original comment sought to expound upon the plot of the book *Altneuland* by Theodor Herzl (which translates in English to *The Old New Land*), and was wholly critical of Zionist claims over Palestine. Another reader later posted a reply claiming that the "Jews are the indigenous people" and further excusing the genocide and displacement of Palestinians from their land. Joachim later responded to this reply, stating, upon other

things, that only a "moron, ignoramus, or liar claims that modern Jews... have any more connection to ancient Judeans than modern Roman Catholics have to ancient Romans.... We modern Jews all descend from non-Judeans that converted to Judaism." Joachim's comment contained no threat of violence and was based on historical facts. Yet because Joachim is a Jewish critic of Zionism, Harvard *Crimson* rejected and removed this latter comment Joachim's posted without similarly rejecting and removing the other reader's reply, which espoused Nazi-like ideas.

77. This Defendant has a long history of publishing pro-genocide anti-Palestine content and routinely discriminates against those that attempt to use the public accommodation that this Defendant provides for exhibition and entertainment by allowing readers to comment on published articles. Additionally, while this Defendant is quick to remove any comments expressing a pro-Palestinian, anti-Zionist viewpoint, it does not remove the comments posted by pro-Zionist readers.

## Claims of the Plaintiff

### Count I – Violation of Title II of the CRA of 1964

78. All of the foregoing allegations are incorporated at this point as if they were fully set forth in detail in this count.

79. The Defendants have all violated Title II of the CRA. They must restore all our suspended accounts as well as all the content of the Plaintiff that the Plaintiff has been prevented from accessing. If any content cannot be restored by any defendant, the Defendant must compensate the Plaintiff for destroyed content. The Defendants must cease to harass the Plaintiff in any way as the Plaintiff uses the social medium platforms. The Defendants must never suspend any account of the Plaintiff. The Defendants must compensate the Plaintiff for all harm that the suspensions have caused the Plaintiff.

### Count II – Penalties for Denial of Common Carriage

80. All of the foregoing allegations are incorporated at this point as if they were fully set forth in detail in this count.

81. The common carrier Defendants violate common carrier law by suspending the Plaintiff and must restore all the suspended accounts of the Plaintiff.

82. The common carrier Defendants have refused common carriage to the Plaintiff at least 40 times a day per suspended account since December 20, 2018. Not every state has statutory penalty for denial of common carriage, but the Massachusetts statutory range seems normal. At the lowest penalty ($50) that Massachusetts could levy per refusal, the common carrier Defendants must pay the Plaintiff at least $365,000.00. Many individual attempts to use the common carriage which the Defendants hold out had been destined for as many as 20 end users. Such a denial of common carriage represents approximately 20 separate denials of point-to-point common carriage. In addition, the maliciousness and bad faith of

the common carrier Defendants' denial of common carriage justifies assessing the maximum common carriage penalty ($500) per instance of denial of common carriage. At the $500 penalty, the common carrier Defendants owe the Plaintiff approximately $3,650,000.00 or more.

**Relief for Violation of Title II of the CRA**
**and**
**for Denial of Common Carriage**

WHEREFORE, the Plaintiff prays

1. that a judgment be entered in their favor and against the Defendants;

2. that compensations for damages, torts, and inconveniences be awarded to the Plaintiff in an amount to be determined, plus interest and costs; and

3. that the Defendants be compelled to undertake preemptive and curative actions not limited to those described above to correct and remedy Title II CRA and common carriage law violations that the Defendants have been committing.

**Jury Demand**

In accordance with Federal Rule of Civil Procedure 38 (b), the Plaintiff hereby demands trial by jury with respect to all claims or issues so triable.

Dated: _July 2, 2021_

Respectfully submitted by

Joachim Martillo
75 Bailey St. Ste 1L
Dorchester Center, MA 02124-3724
ThorsProvoni@protonmail.com
617-276-5788
*Pro se*

**Overview of Complaint Filed *pro se***
**in**
**Boston Federal Court of the District of Massachusetts**

*Martillo v. Twitter et al.*
Case No:_____

Joachim Martillo is frequently suspended from social medium Interactive Computer Services (ICSs) in violation of Title II of the Civil Rights Act of 1964 and in violation of Massachusetts Common Carriage Law. These suspensions interfere with his job search and have severely affected his income. He followed a suggestion contained in an *obiter dictum* in a recent concurrence from Supreme Court Justice Clarence Thomas and wrote the complaint that he is herewith filing *pro se* in Boston Federal Court. See the following page, which comes from the complaint.

In this filing, he includes the following six classes of documents:

1. this Overview,

2. the Complaint,

3. the Civil Cover Sheet,

4. the Civil Category Sheet,

5. AO240 Petition for Waiver of Fees, and

6. six completed summonses.

When an extra page has been added to document (2), it may be a copy of a page from document (3) as the footer of the extra page indicates.

This overview is respectfully submitted by:

Joachim Martillo, *pro se*

*Joachim — Martillo*

75 Bailey St Ste 1L          July 2, 2021

Dorchester, MA 02124

(617) 276-5788

ThorsProvoni@protonmail.com